AMERICAN NATIONAL BANK OF AUSTIN, TEXAS, v.
P. B. CRUGER ET AL.

Decided December 17, 1902.

**1.—Homestead—Single Woman—Dependent Nephews and Nieces.**

An unmarried woman, residing in her home and there maintaining and caring for a nephew of unsound mind, but of legal age, and several youthful nieces, children of an insane sister, was the head of a family and entitled, as such, to the homestead exemption.

**2.—Same—Moral Obligation and Dependence.**

The right of an unmarried woman, caring for nephpews and nieces living with her, to the homestead exemption, is not dependent solely on moral obligation to support them. If dependent for moral training as well as partial support, they might constitute her the head of a family, though they were owners of a farm worth over $5000, the proceeds of which contributed to their material support.

**3.—Homestead—Rights of Tenant by Sufferance.**

The homestead right may inure to the benefit of one who has conveyed away the property sought to be levied on, but remains upon it as a tenant at sufferance.

Appeal from the District Court of McLennan. Tried below before Hon. Marshall Surratt.

*Eugene Williams,* for appellant.

*Boynton & Boynton,* for appellees.

KEY, ASSOCIATE JUSTICE.—Appellant's brief correctly states the nature and result of this suit, as follows:

"This action was brought June 14, 1895, against P. B. Cruger and Miss Fannie M. Cruger, to recover an indebtedness due by them to the American National Bank, appellant, upon a note of date December 10, 1894, due six months after date. An attachment was levied upon a lot 150x175 feet, known in the record as the Helen Cruger tract. P. B. Cruger was the principal on the note, Miss Fannie being surety. The case was first tried and appealed to this court from a judgment in favor of the bank against P. B. Cruger, and in favor of Miss Fannie, declaring the note as to her fraudulent. Upon the appeal, the issues were so far elucidated as that upon the second trial, from which this appeal is taken, judgment was rendered in favor of the bank against P. B. Cruger and Miss Fannie on the note for $6347.50, with 10 per cent interest from January 29, 1902, the date of the judgment, leaving open, however, a question of homestead, upon which appellant's assignments of error are based in this appeal.

"The pleadings show that Miss Fannie died after the first appeal was taken, and her executor, C. A. Boynton, and Miss Helen Cruger, a grantee of Miss Fannie, were made parties in her stead, the latter claim-

ing that on June 14, 1895, she was the real owner of the Helen Cruger tract, and should be protected in such ownership by the fact that this property was the homestead of Miss Fannie. Miss Helen's deed bore date March 15, 1895, and the testimony showed it was delivered about that date, several months prior to the attachment, June 14, 1895, but that it was not recorded until June 17, 1895, three days after the attachment.

"The court charged the jury to find for appellant as to its debt against P. B. Cruger and the estate of Miss Fannie, and to find for Miss Helen, and that the Helen Cruger tract 'was the homestead of Fannie M. Cruger at the time of the levy of attachment in this case, and that plaintiff acquired no lien thereon by such levy.'

"Upon this issue the defendants pleaded that Miss Fannie was in her lifetime an unmarried woman, having under her care an afflicted nephew and several youthful nieces; that she gave them support, and was thus constituted the head of the family, so as to give her a homestead in the said tract, and that when she conveyed it to Miss Helen, March 15, 1895, she had a right so to do, and that by reason of Miss Fannie's homestead right, the levy of June 14, 1895, was void as to Miss Helen."

The action of the court in withdrawing from and not submitting to the jury the question of homestead is assigned as error. The testimony bearing on that question is correctly set forth in appellees' brief, as follows:

The following agreements were introduced: "It is agreed between plaintiffs and defendants, that at the time of the levy of the attachment all of the property except the three lots on the corner of Speight and Ninth, on which were located the house and barn, was mortgaged property, and that the mortgage has been foreclosed and the property sold under it, and nothing is involved in this suit, except the three lots on which the house and barn, etc., are located."

The following agreement was introduced by defendants: "It is agreed by and between the parties hereto, in order to save expense, that on July 16, 1892, Miss Fannie Cruger executed a deed of trust to L. H. Hole, to secure J. W. Campbell in a note of $3000 of that date, due August, 1897, bearing 6 per cent interest, and a second deed of trust to the same trustee to secure the payment of ten notes, aggregating $1500, bearing 10 per cent interest, due from time to time, between July 16, 1892, and August 1, 1897, the property described in said deed of trust being as follows: 'Beginning at a point on the southeast line of Speight street where said southeast line crosses the southwest line of two acres of land conveyed by J. H. Bagby and wife to D. T. Chamberlain, said conveyance being shown in book M., page 450, of McLennan County deed records, which point is 30 feet south, 45 feet east from the original northwest corner; thence north 45 east 85 feet to the northwest corner of two lots sold by Fannie Cruger to Long; thence south 45 east 165 feet to Long's southwest corner; thence north 45 east 100 feet to Long's southeast corner; thence north 45 west 165 feet to southeast line of Speight street

and Long's northeast corner; thence north 45 east 265 feet; thence south 45 east 165 feet; thence north 45 east 150 feet to the southwest line of Ninth street (said point being also 12 feet southwest from original northeast line of Noriss' three-acre tract) ; thence south 45 east 185 feet to the northwest line of James street; thence south 45 west 600 feet along the northwest line of James street to the southwest line of the aforesaid two-acre tract; thence north 45 west 350 feet to beginning.'

"And it is further agreed that this stipulation may be read in evidence by either side."

Said agreement being dated November 14, 1895, and signed by Eugene Williams, attorney for plaintiff, and Boynton & Boynton, attorneys for Fannie Cruger.

Miss Fannie Cruger's testimony as given on the former trial (she having died since that time) was introduced by agreement; on the homestead issue, it is as follows:

"The property and land upon which the attachment in this suit was levied on the 14th day of June, 1895, is my homestead, with the exception of two places not owned by me, but belonging to Mr. Leslie and Mr. Long. This real estate was purchased by me as my home, and for which I paid $1100, some time about 1872, and has all been included in and lived upon and used as my homestead by myself and family. The house in which we live is on the corner of this property, which is all inclosed and cut off from the rest of the property by a yard fence, in which there are gates opening into the rest of the property, which I use as a garden, and at times to turn in and pasture upon my horses. This is all the real estate I own. I have been living with two daughters and a son of my brother Charles Cruger. The father and mother of said children are dead, and they have no other home or property, and are entirely dependent upon me for a home. I took these children, with the exception of the younger one, together with three others, their brothers and sisters, and children of my brother Charles, to raise and support, some twenty years ago, and the younger one several years ago. At the time I took them to raise and care for their mother was insane, and had been sent to the insane asylum a time or two, and finally became violently insane. I have raised, maintained and supported them entirely from the use of my own funds, and provided them a home with me. Of those now living with me, one is an unmarried female of about 22 years of age, and one a girl about 13 or 14 years old, and the other a man who was once in the insane asylum and is now a confirmed invalid, and has been so for many years, unable to support and maintain himself, and requiring constant care and attention. And they are wholly dependent upon me and my property for support and their home."

J. T. Anderson testified as follows: "I have resided in Waco for about thirty-five years, and for about thirty-three years I resided in the neighborhood of Speight street. I knew Miss Fannie Cruger well in her lifetime, and lived just across the street from her. When I first knew her, her household consisted of three little girls and two little boys

and herself.  The mother of the children was there, too, at that time; she was deranged.  I think that was in 1873, if I am not mistaken. Several years afterwards there was another little girl born to the mother, and she came there, too.  I know only what they said what relationship these children bore to Miss Fannie Cruger.  They were her brother's children.  The most of these children have lived there ever since I first knew the family.  One was deranged, the oldest boy, and he lived there until just before Miss Cruger's death, when they sent him off to the asylum, and then the two single girls were there all the time.  The others married off and left there at the time they married.  Within my knowledge that has been the home of these children since 1873.  When I first knew the family, they lived in a small frame house very near the center of the property, right opposite where I lived, and I lived between Ninth and Tenth streets.  Afterwards, Miss Fannie Cruger built another residence down in the corner of the block, next to Ninth street, fronting on both Ninth and Speight.  There are also a barn and servant's house there.  There is a fence to separate the inclosure from the rest of the property; I think that fence was put up about the time the buildings were built.  Miss Fannie Cruger continued to reside there with these ladies and such members as there were of the family up to the time of her death continuously, and from the time she erected that house.  The mother and father of these children are dead.  The mother has been dead about fifteen years, and it seems to me the father died five, six or seven years later.  As to whether or not Miss Fannie Cruger supported these children, I know of my own knowledge that she bought the groceries and paid for them.  The children had no other home that I know of.

"P. B. Cruger, of Austin, was a nephew of Miss Fannie Cruger.  His father's name was James and his mother's name was Henrietta.  I knew them and also knew their brother C. P. Cruger, and had heard Miss Fannie speak of a brother who was dead.  The father of Miss Helen Cruger, who was named Charles, came there once in a while; I don't know where he lived; I heard he lived in Bell County.  He had two sons, Frank and Harry.  Harry is living in Waco now, and is an intelligent hardworking man, able to take care of himself.  He has a family. I think he has been married probably eight years,—somewheres along there.  When he married he built a house on Third street and lived there with his wife.  On June 14, 1895, Frank, the crazy boy, and Miss Helen and Miss Annie were living with Miss Fannie Cruger, and I think Miss Nettie, who is now dead, was there, but am not sure.  Frank at that time must have been 22 or 23 years old; he might have been older than that, but I should say that old anyway.  Miss Nettie married.  I do not remember whether she married before June 14, 1895, or not, and do not recollect whether she was a member of the family then or not. I do not know how old Miss Helen was at that time; I would consider her an ordinary girl; I do not consider her very bright.  She was a very small thing about a year or a year and a half old when I first knew her

in 1873. Annie came there four or five years after 1873, and was about a year old when she came there; that was about 1878; when the two boys and girls came there in 1873, their ages ranged from 8 to 10 years old down. I heard Miss Fannie say the father of the children lived in Bell County and had a little farm down there. I did not know the farm rested in the name of Miss Fannie Cruger as trustee, nor that the rents of the farm came to her to support the family on. I think Fannie was the first of the children to marry; she married somewhere about 1890, 1891, or 1892. The next to marry was Harry, two or three years after Fannie married; and then Miss Nettie married six or seven years ago. I think Frank was taken to the asylum after Miss Fannie's death. At the time of Miss Fannie's death she was in possession of this property; they were all three there. There had been no change in the condition of the household from 1895 until the time of her death, that I know of. I knew the two young ladies intimately, and know the facts with reference to their manner of living like I would any ordinary person. I should say Miss Helen was not physically able to work; she had a tumor that kept her from doing much. I think the other one could work. I think Miss Helen had the tumor at and before the property was attached; she has never been a stout girl, and has been operated on. I never saw her do any physical work, but saw her catch a horse once. The other young lady seemed to be in the usual health.

"I knew Frank Cruger from the time he was a small boy. He could not earn a livelihood at all. When I first knew him for four or five years he had tolerable fair sense, and would play with the boys, but he became crazy and got very dangerous, and they sent him to the asylum, and in a very little while, his mind just gave way, and he was not dangerous but did not know anything; he was wholly dependent upon somebody's taking care of him for several years before Miss Fannie's death."

H. T. Cruger testified as follows: Witness was a nephew of Miss Fannie Cruger and a brother of Miss Helen and Miss Annie Cruger. Witness was raised by his aunt, Miss Fannie Cruger. He was between 9 and 10 years old when he went to live with her, and all of his brothers and sisters went with him except Annie. Annie was small when she came. Thought it was 1870 to 1871 when he went to live with Miss Fannie M. Cruger. She came to Bell County farm about a year before the children came to Waco and took care of them. Afterwards the Cruger children came to Waco. Their home was with her on Speight street. She furnished them with the funds with which they were schooled and raised from her individual funds as far as witness knew. Witness considered Miss Fannie Cruger as a lady of considerable means at that time. Thought she had money enough to support said children but did not know just how much she had. He knew Mr. Fred Rice had charge of her business and owed her money, but did not know how much; he supposed she was considered wealthy. While Miss Fannie M. Cruger was on the Bell County farm the whole C. P. Cruger family was there except Mrs. C. P. Cruger, and she was brought there afterwards. That

was C. P. Cruger's home at that time in one sense of the word, and the witness understood that the place belonged to his father while he was living there.

Plaintiff introduced in evidence a deed of date November 23, 1872, executed by James F. Cruger and wife, H. M. Cruger, in consideration of love and affection, to C. P. Cruger, brother of J. F. Cruger and to his children, conveying about 574 acres more or less, of land in Bell County, Texas, described in said deed, as well as fifty mares and fillies out of J. F. Cruger's stock, then in charge of said C. P. Cruger. Said deed provides that said property is conveyed to C. P. Cruger and Frances M. Cruger "and the survivors of them in joint tenancy in trust, however, and to the use and purpose hereinbefore set forth and expressed, viz: The said land to the use and benefit of said C. P. Cruger for and during the term of his natural life, and after the death of said C. P. Cruger to the use and benefit of his children, including those he may hereafter have, being living at the time of his death, to be equally divided between the said children and share alike, and the said stock of horses, mares and fillies to the same uses; thus, however, in this manner the male increase thereof, the colts, to the use of C. P. Cruger in full property the female increase, the fillies to the use of the children of the said C. P. Cruger living at the time of his death to be equally divided between them, share and share alike, stock of horses now on hand to be the property of C. P. Cruger to his own use, the females of the stock to be the use of his children as aforesaid, so that enough males should be left in the stock of mares to keep up the increase the stock as is ordinary or usual in such cases to be kept for said stock, but it is provided that the said C. P. Cruger shall not have any charges or claim against his said children for the care of said mares the property hereby given to him being to be taken as a full satisfaction of such claim and a full consideration of his care and labor in preserving and increasing said property for said children; and I hereby clothe the said C. P. Cruger and Frances M. Cruger, trustees as aforesaid, and the survivors of them with a power if they should deem it their interest of the said C. P. Cruger and the children to sell in such manner as they or survivors may deem advisable all the property herein conveyed to them as aforesaid in the trust, however, that the proceeds of any such sale of said property or any part thereof shall be invested in other property in trust to the same uses as declared above in this instrument of settlement in our intention by this power to enable the said trustees to change the investment, so as to be most advantage to the beneficiaries according to their judgment and discretion either in property of different kind or putting the proceeds of such sales at interest, but always so that the uses shall be preserved to the said C. P. Cruger for life and for his children living at the time of his death."

J. H. Edwards testified by deposition, for the plaintiff, that he knew the land conveyed by above described deed, located near Killeen, in Bell County, Texas. Witness lived on said land continuously from 1880 to 1892. There about 100 acres in cultivation. The Gulf Colorado &

Santa Fe ran through the tract. During the time witness was on the land Joe Benton, Joe Harber, and Jake Keel made crops on the land. The house was a 14x16 log room with the same size box room on one end, and a shed room about ten feet wide ran the entire length, with a porch in front. There was a crib and a well which only afforded water part of the year; when dry, water was secured from a spring. Witness paid one-fourth of the cotton and one-third of the corn as rent. Some years the crops were light; other years the crops were good. Witness rented the place from a merchant in Killeen by the name of Sawyer. Witness paid the first rent to Mr. Sawyer and then Charley Cruger began to collect same. C. P. Cruger never was a resident on the land while witness was on it. He made occasional visits. He stayed at the witness's house and paid board. He never made a crop on the land that witness knew of. He and a nephew started a crop one year, but they quit it. Witness knew C. P. Cruger and his wife and one daughter who was small at that time. Her name was Annie. Did not know any of his children except Annie, and could not state her age. Mrs. C. P. Cruger was insane when witness moved on the farm. She then lived in a little house across the creek from where witness lived, and continued to reside there until she died. At times she was rational and at others perfectly crazy. Never knew that she was confined in an insane asylum. She spoke of her children, and appeared to think a good deal of them. Never knew that she ill-treated her daughter Annie Cruger, who lived with her during the time witness knew her. The elder daughters lived with her aunt, Miss Fannie Cruger, in Waco; they were living with Miss Cruger before witness moved on the place. Mrs. Cruger was insane in 1880.

Mrs. M. J. Sawyer testified by deposition, for the plaintiff: C. P. Cruger is dead. Lemuel Sawyer was witness's husband; he is dead. Lemuel Sawyer had the rental of the farm of C. P. Cruger and collected rents. The tract of land near Killeen, with which Chas. P. Cruger had something to do in his lifetime, was the land on which Lemuel Sawyer collected rents. The cotton rents were paid Miss Fannie Cruger by Mr. Sawyer. There were two houses on the land. Don't know how much land was in cultivation. Witness was acquainted with C. P. Cruger from 1873 to 1884. She was acquainted with the family of C. P. Cruger. His wife's name was Virginia Cruger. She was considered of unsound mind, and at one time was confined in the insane asylum. She was considered dangerous at times. Miss Fannie M. Cruger, after Mrs. C. P. Cruger had given signs of having an unsound mind, took all the children but the two youngest to her house in Waco. Mrs. C. P. Cruger died in 1884.

C. W. Ladwig testified by deposition, for plaintiff: Witness resides in Killeen, Texas, and knew C. P. Cruger in his lifetime; when acquainted with him, he was staying on his farm with his renter near Killeen. He got rents from said property, a third and a fourth of corn, cotton and oats. Some he took and some he sent to Waco. Heard of his death in Waco. Cruger exercised control over the property when

he was there, and when he was absent the profits were sent to parties in Waco. P. B. Cruger lived in Bell County three or four years and came back and forth from Waco. Witness was the merchant who supplied Cruger and his renter.

J. R. H. Benton testified by deposition, for plaintiff: Witness knew Lemuel Sawyer and C. P. Cruger in their lifetime; both are dead. Witness rented some of the Cruger land from Sawyer, who acted as agent for Cruger and collected the rents. The grain rents were turned over to Lemuel Sawyer. After the death of Lemuel Sawyer, Chas. and Harry Cruger visited Killeen. They found a balance due and the same was paid to Charles Cruger. C. P. Cruger, wife and daughter Annie, lived on the property from 1875 to about 1880. The improvements consisted of two tenant houses and 100 acres in cultivation. Witness knew C. P. Cruger from 1875 until his death. Mrs. Cruger was considered of unsound mind; she first showed symptoms of being of unsound mind before I knew her. She was dangerous. Miss Fannie Cruger, after Mrs. C. P. Cruger had given symptoms of being of unsound mind, took her daughters to Waco and raised them."

There is no conflict in the testimony, and we are of the opinion that the facts established thereby show, as a matter of law, that at the time of the levy of the attachment Miss Fannie Cruger was the head of a family, and that the property levied on was her homestead.

Counsel for appellant contends that as the testimony shows that the nephews and nieces alleged to constitute the family of Miss Fannie Cruger were the owners of a valuable farm, therefore, they were not dependent upon her for support; and consequently she was not the head of a family; and the case of Roco v. Green, 50 Texas, 490, is relied on in support of that contention. In that case, the court said:

"We deduce from the authorities the following general rules to determine when the relation of a family, as contemplated by law, exists: 1. It is one of social status, not of mere contract. 2. Legal or moral obligation on the head to support the other members. 3. Corresponding state of dependence on the part of the other members for this support. Thomp. on H. and E., secs. 45, 46, and authorities cited."

Notwithstanding the test there prescribed, in the subsequent case of Wolfe v. Buckley, 52 Texas, 649, the same court, in an opinion prepared by the same judge, considered, as a factor in determining the question of homestead, the fact that the minor children were dependent upon Mrs. Buckley for moral training, as well as for partial support and maintenance. Of course, Miss Fannie Cruger originally was under no legal obligation to support and maintain or nurture her nephews and nieces; but having taken them from their former home twenty years before the controversy in this case arose, and having undertaken to rear, train and nurture them, and having contributed largely to their support and maintenance, undoubtedly, there rested upon her a moral obligation to continue so to do, as long as they were in a state of dependence; and the word dependence, as here used, is not restricted to sup-

port and maintenance—food and clothing. It is intended to include moral and mental training, and that care and nurture which would be prompted by the feelings of affection which the testimony indicates existed between this aunt and the children of her unfortunate sister. Barry v. Hale, 21 S. W. Rep., 783; Smith v. Wright, 36 S. W. Rep., 324.

It is also contended that, as Miss Fannie Cruger had conveyed the property in controversy by deed to Miss Helen Cruger before appellant's attachment was levied, by reason of such conveyance Miss Fannie Cruger abandoned her homestead right. The testimony shows that after the execution of the deed referred to there was no change of possession; that Miss Fannie Cruger continued to occupy the property as she had before, and was so in possession of it, together with the other members of her family, including Miss Helen, the grantee in the deed, at the time the attachment was levied. As between Miss Fannie Cruger and the grantee in the deed, Miss Fannie was, at the time the attachment was levied, at least a tenant by sufferance; and this court holds that a homestead right may be predicated upon a bare right of possession, without any other title. Our views on that subject are more elaborately expressed, and the authorities in support thereof are collated, in the case of Birdwell v. Burleson, this day decided.

No error has been pointed out by appellant, and the judgment will be affirmed.

*Affirmed.*

### SUPPLEMENTAL FINDING OF FACT.

The tract of land referred to in our opinion, conveyed by James F. Cruger and wife to C. P. Cruger November 23, 1872, and containing about 574 acres, was worth at the time of the trial $10 per acre, and we make this finding of fact in response to appellant's request.

Writ of error refused.