### HUTCHENRIDER et al. v. SMITH.
### (No. 313–3645.)

(Commission of Appeals of Texas, Section B. June 14, 1922.)

**1. Homestead ⬡⟾81—Father owner of homestead though title in daughter with whom he lived.**

Where a house adjoining the family home was acquired in 1909 and used in part by the family as their homestead, it became impressed with homestead character and exemption, and after destruction of the home by fire and the house was the sole dwelling place of the family its homestead character was unquestionable, even though the title in 1909 was taken in the name of an unmarried daughter and after the death of the mother the land was voluntarily partitioned by the father among three daughters, reserving, however, the right to live with them, and exacting a contract for support from them for the remainder of his life.

**2. Homestead ⬡⟾17—Father living with his daughters supporting him constituted "family."**

Where a father had conveyed his homestead property to his three daughters, if the daughters were nurturing, caring for, and furnishing the aged father the necessities of life, the four constituted a "family" within the meaning of the Constitution, and the property so occupied was not, while these conditions continued, subject to forced sale except as provided in the Constitution.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Family.]

**3. Mechanics' liens ⬡⟾73(3)—Liens not foreclosed on homestead unless contracted for in writing.**

Liens for work and material cannot be foreclosed on a homestead unless the "work and material are contracted for in writing," as provided by the Constitution.

**4. Homestead ⬡⟾177(2)—Owner's declaration that property was not homestead not estoppel from claiming as such.**

Where a contractor furnished work and material in repairs to a homestead and the facts showed that the property was used as a home, the possession by the family being actual, open, and visible, notwithstanding the declarations of one of the owners that the property was not her homestead, the homestead could not be taken on foreclosure of the contractor's liens, even though the statement was made denying its status as a home.

**5. Trial ⬡⟾143—Questions material to defense, supported by evidence, submitted to jury.**

Every question of fact material to defendant's defense as pleaded, which finds support in conflicting evidence, should, upon request, be submitted to the jury.

**6. Contracts ⬡⟾176(11)—Failure to submit issue as to contract for cost of repairs to building reversible error.**

Where there was an issue as to whether an oral contract for repairs to a building was to exceed $6,500, the amount claimed by defendants as plaintiff's cost estimate, the failure to submit such issue in plaintiff's suit for $11,000 as the amount expended by him on the cost plus contract was reversible error.

Error to Court of Civil Appeals of Fourth Supreme Judicial District.

Suit by William Smith against Theresa Hutchenrider and others. From judgment of the Court of Civil Appeals (228 S. W. 989) affirming judgment for plaintiff, defendants bring error. Reversed and remanded for new trial.

J. D. Williamson, of Waco, for plaintiffs in error.

Johnston & Hughes, of Waco, and Locke & Locke, of Dallas, for defendant in error.

POWELL, J. In 1885 or 1886, Herman Hutchenrider and his wife, Emily Hutchenrider, acquired a house and lot at 927 Washington street in the city of Waco, which they made their home. Six children, two boys and four girls, were born to them. They resided and used this place exclusively as their home until 1909, when an adjoining lot and house at 1003 Washington street were acquired. Both places had an aggregate frontage of 150 feet on Washington street. When the place at 1003 Washington street was acquired, the title was taken in the name of Miss Theresa Hutchenrider, one of the daughters, as a matter of convenience. The sum of $6,000 was paid and agreed to be paid by the Hutchenriders for this latter place. One half of said sum was paid in cash. The other half was evidenced by two promissory notes executed by Miss Theresa. The cash payment was made by Herman Hutchenrider with the proceeds he realized from a sale in 1909 of his business homestead in Waco, and the proof showed that he, with the help of his wife and children, paid off the two notes aforesaid. Although the legal title to the place at 1003 Washington was in the name of Miss Theresa, she testified, without contradiction, that she made no claim to this property, or any part

of it, until a partition of the estate was made and finally effected in June, 1918.

When the place at 1003 Washington was purchased in 1909, the division fence between it and the 927 Washington place was partially removed and the yards of the two houses thrown together. The proof showed that the family ran a boarding house at 927 Washington and rented rooms at 1003 Washington; that both places were operated together; that both yards were used for various domestic purposes; that during all of those years the Hutchenrider children slept first in one house and then in the other. During certain portions of the time, some of the children were sleeping in one house and the others in the other house at the same time.

The use and occupancy of both of these places as a home continued until March 1, 1917, when the home at 927 Washington was destroyed by fire. In the meantime, about January 1, 1917, the wife of H. Hutchenrider passed away. After her death, her husband and his unmarried children continued to use both places as aforesaid, until the destruction of one of the places by fire. Immediately after the fire the father and three unmarried daughters, Theresa, Rose, and Edna, moved into 1003 Washington, where they were still residing at the time of the trial of the case at bar.

. In July, 1917, just a few months after the death of Emily Hutchenrider, the wife and mother, H. Hutchenrider decided to partition these properties on Washington street among his children, subject to his being furnished a home. These lots constituted the valuable parts of his estate. The partition was agreed upon, but deeds were not finally passed thereunder until June, 1918. On June 3, 1918, H. Hutchenrider and the three unmarried daughters, plaintiffs in error here, conveyed the lot at 927 Washington street to the married daughter, Annie Harris, and the two sons, L. H. and Adolph Hutchenrider. The deed showed on its face that it was executed for love and affection and in pursuance of a partition agreement. This deed went to record at once.

On June 6, 1918, Theresa Hutchenrider, the holder of the legal title to 1003 Washington street, conveyed an undivided one-third interest therein to her sister Rose, and a like interest to her sister Edna. The consideration expressed in this deed was love and affection, and it also showed that it was executed in pursuance of a partition agreement. This deed also went to record at once.

The record further shows that Miss Theresa was a teacher in the public schools in Waco, and that her sister Rose was employed in the Waco Public Library; that these two girls, assisted by their sister Edna, as housekeeper, had taken care of their father,

83 years of age at the time of the trial, for some time. They said it was understood that they were to continue to care for and support him; that he was to live with them in the house at 1003 Washington.

It will be seen that three of the children were given the place at 927 Washington and the other three, the unmarried daughters, the place at 1003 Washington, subject to the furnishing of a home to H. Hutchenrider, their aged father.

The father wanted an agreement in writing from his children and he exacted that from them. This was executed March 29, 1918, and was introduced in evidence by Smith, plaintiff in the trial court. That written agreement shows that the aged father had given up his interest in both places in consideration of the agreement on the part of his children to furnish him a home or room in which to live, as well as the other necessities of life.

Miss Theresa testified that it was agreed by and between the six children that the father should continue to live at 1003 Washington with the unmarried daughters, as he had done since his wife's death and before the support agreement was executed. He was so living at 1003 Washington with his three unmarried daughters in 1918 when the transactions out of which this litigation arose took place. Miss Theresa stated that it was the pleasure of the unmarried daughters to give their father a home; that the other children were married and had homes of their own and could not conveniently care for their father in this way.

The three girls decided to enlarge and improve the house at 1003 Washington, converting it into a home suitable, in part, for rent as apartments. They had Roy Lane, an architect, make a pencil sketch of their views and ideas, and then in February, 1918, they called upon William Smith, defendant in error here, a contractor, for a consultation. He was an experienced house builder in Waco, having been so engaged for 8 or 9 years. After a conference, Smith told them that the improvements, as outlined on the pencil sketch, would cost between $6,500 and $7,000. The negotiations continued from their beginning in February, 1918, until Smith actually began work the latter part of June of that same year. The jury found that the contract was finally entered into on or about May 4, 1918. It is undisputed that work commenced about the latter part of June, as aforesaid. Before the contract was closed the pencil sketches were enlarged by architect Lane and fully developed, but strictly along the lines of the original pencil sketch.

The contract between the girls and Smith was entirely oral, and this gives rise, no doubt, to the real cause of the litigation. Smith claimed that he was to do the work

without limit of price and that, as remuneration for his trouble and supervision, he was to receive 10 per cent. of the final cost of the improvements; that he could finish the work when he pleased and was unlimited as to time.

On the other hand, the girls claimed that the work was to be completed by September 1, 1918, and that Smith had repeatedly assured them that the total cost of the work, including his and the architect's fees, would not exceed $6,500; that they had agreed to have the work done because of these representations; that but for this estimate upon which they relied, they would not have had the work done at all.

Upon the strength of this estimate, the record shows that the girls arranged with the Old Dominion Trust Company to borrow $7,000 with which to pay for these improvements. Some time after the work had commenced, this amount was increased to $8,-500, the extra amount being required by the girls to pay for plumbing, heating, and lighting fixtures, which it was always understood they were to furnish.

Smith proceeded with the work from the latter part of June, 1918, to about January 1, 1919. On the latter date he rendered the girls their first full account, and asked them for something more than $11,000, instead of $6,500, which they alleged he had agreed would be the maximum of cost. The girls refused to pay the bill so submitted and the litigation followed shortly thereafter.

These young ladies had paid several amounts to Smith and had also settled for certain materials. Smith claimed a balance of $6,390.82 and he sued the three for that amount. He claimed that most of this amount was due for labor and material; that he had fixed his lien by filing these accounts under the statute; that he should have a foreclosure of his mechanic's and materialmen's liens on the premises as against all the girls, and also as against the Old Dominion Trust Company which he made a party defendant. The trust company had arranged to advance $8,500 to the girls and had taken liens therefor. It answered that it had never actually paid any money to the Hutchenriders and had no lien on the property except for expenses incurred for examination of the title and preparation of papers for the loan.

The three daughters answered by general and special exceptions and general denial. They further specially pleaded that Smith had agreed to do the work for not more than $6,500; that they had paid him the sum of $3,653.80, upon the contract, leaving a balance due him of only $2,846.20; that the work had not been done in a workmanlike manner and that by reason of the defects they had been required to pay $229.35 to have the work corrected; that they were entitled to a credit for that amount also; that the improvements were not completed on time as per the contract, resulting in their further damage in the sum of $680.

They further pleaded the aforesaid facts showing the homestead character of the property and that Smith well knew said facts; that, by reason thereof, Smith was not entitled to a foreclosure of a mechanic's lien on the property.

Again, the defendants, by way of cross-action, alleged:

"That they were induced to enter into the contract with William Smith for the erection and construction of the improvements on said premises by reason of his representations to them that the improvements upon said premises could be erected and constructed, inclusive of his fee or profit and the architect's fee, for the sum of $6,500, and that he would undertake its erection and construction for said sum. That they were unversed in the cost of building and repairs, and relying upon his statements and representations, he representing that he knew such costs, they agreed to have said improvements made, based upon such representations. That if said improvements cost the amount claimed by the defendant, and by reason thereof a liability against them had been created for $4,566.90 in excess of the agreed price, that same was created on account of the false and fraudulent representations made to them by the said William Smith, and if they had known that the improvements could not have been erected at a cost of $6,500, that they would not have undertaken such improvements, and that if it be determined that they are liable for the total sum of $11,066.90, then they were damaged by the said William Smith by such fraudulent representations in the sum of $4,566.90, and he was estopped from recovering that sum from them and they were entitled to judgment for said amount."

The trial was had before a jury. Upon their answers to special issues, judgment was rendered by the district court in favor of Smith, as against the Misses Hutchenrider, plaintiffs in error here, for $6,390.82, as prayed for by him, with interest and a foreclosure of the liens claimed by him on the premises as against all the parties. This judgment of the district court was affirmed by the Court of Civil Appeals at San Antonio, whence the case was duly transferred from the Court of Civil Appeals at Austin. See 228 S. W. 989.

The girls made application to the Supreme Court for writ of error. Same was granted, and the cause is now before us for review and recommendation.

[1] The Court of Civil Appeals says that the only real contest in the case is as to the homestead character of the property. We agree that this is one of the two main questions presented upon this appeal, and we first address ourselves to this question. Was the property at 1003 Washington street a homestead of a family when the contract

for the improvements in suit was made? The position of plaintiffs in error in this regard is twofold:

"First. That the premises at 1003 Washington street became impressed with the homestead character and exemption at the time of its purchase, and remained so to the time of trial.

"Second. It unquestionably became so impressed at the time of the fire, which destroyed the premises at 927 Washington street."

We have most carefully read the voluminous record in this case and have reached the conclusion that, under the uncontradicted evidence, both of these positions of counsel should be sustained. We have outlined the facts as to homestead in stating this case, and we think our conclusions are sustained by the evidence of not only the girls, but the other witnesses as well. As we view the evidence, it leads irresistibly to the facts as we have stated them, and each fact finds unquestioned confirmation in the written instruments introduced in evidence.

We think the place at 1003 Washington became impressed with the homestead character in 1909 when first purchased. That it really belonged to H. Hutchenrider and not his daughter Theresa, is beyond question, we think. The uncontradicted proof shows that he paid for it. Furthermore, the partition deeds and the support agreement executed by the children showed that the father owned this property. In the latter, the children admitted in writing the interest of their father in both places. Not only so, but Miss Theresa deeded each unmarried sister a one-third interest in the property at 1003 Washington without consideration except upon the theory that it belonged to her father, and he wanted each of these three girls to own it in equal portions. The record shows no facts suggesting any reason why Miss Theresa at that very time should have given her sisters all this property without consideration. If she had been the equitable as well as the legal owner of the land, her conveyance to her sisters would have been purely a gift. These written instruments show beyond question that this property at 1003 Washington belonged to the estate of H. Hutchenrider and wife, and continued as the property of that estate until June, 1918; that; even then, the aged father reserved, under an agreement with his daughters, a homestead interest therein for the remainder of his life. These partition deeds and written agreements were executed before the work on the place by Smith was commenced. It could not be said that they misrepresented the true situation in order to avoid payment of Smith's claim. If this is a case, as we think it unquestionably is, where constituent members of a family have died off, leaving one or more members surviving on the property,

used as a homestead, then its homestead character continues during the life of the survivors, such as we have here. The Court of Civil Appeals agrees to this view, but does not so construe the facts. If 1003 Washington was a part of the homestead when his wife died, then H. Hutchenrider has an unquestioned right to continue to occupy it during the remainder of his life unless he sells it to some one without any reservations and such grantee desires to dispossess him.

The owners of this property are making no objection to his remaining there. Under these conditions, we think this aged father had an absolute right to continue to use this homestead until his death. The authorities upon this point are uniform. See Lacy v. Lockett, 82 Tex. 190, 17 S. W. 916; Zwernemann v. Von Rosenberg, 76 Tex. 522, 13 S. W. 485; Zapp v. Strohmeyer, 75 Tex. 638, 13 S. W. 9; Kessler v. Draub, 52 Tex. 575; Rutherford v. Mothershed, 42 Tex. Civ. App. 360, 92 S. W. 1021; Blum v. Gaines, 57 Tex. 119; Schneider v. Bray, 59 Tex. 670; Watkins v. Davis, 61 Tex. 416; Stone v. McClellan, 36 Tex. Civ. App. 364, 81 S. W. 753; Reed v. Talley, 13 Tex. Civ. App. 286, 35 S. W. 805.

[2] But let us assume, for the purposes of this discussion, that the property at 1003 Washington had really belonged, legally and equitably, to the girls, and they were maintaining it as a home for their dependent and infirm father. Under those circumstances, we think it would unquestionably constitute a family within the meaning of our Constitution, and that the property would be exempt from forced sale for the payment of a mechanic's lien not contracted for in writing. The Court of Civil Appeals, upon this point, says:

"There can be no doubt that if Miss Theresa Hutchenrider went into the house in controversy, having with her her sisters and father, all of whom were dependent upon her and whom she was morally bound to support, and did support, she might have become the head of a family within the purview of the Constitution."

We do not think the Court of Civil Appeals quite accurate in this pronouncement of law. It was not incumbent upon Miss Theresa to be supporting both sisters as well as her father in order to constitute the property they were occupying a homestead. If she and her sisters were nurturing, caring for, and furnishing their aged and infirm father the necessities of life, the four of them constituted a "family" within the meaning of the Constitution, and the property so occupied was not, while those conditions continued, subject to forced sale except as provided for in the Constitution itself.

The jury did not find that the father was not dependent upon the girls. They did find that neither of the girls supported their fa-

ther and another. The issue as to whether or not the father only was dependent was not submitted to the jury. If it had been, but one answer could have been returned, as we view the evidence. Was he dependent upon his daughters?

He owned a vacant lot in Waco and some acreage property in the nature of vacant lots in the village of Bruceville. There is no evidence that they were revenue producing. The undisputed evidence is that the $3,000 of fire insurance collected after the destruction of the property at 927 Washington street went for the payment of debts. The girls testified that they had been caring for their father all along. He not only needed food and clothing and shelter, but love, companionship, and nursing as well. Their support of him is uncontradicted. Not only so, but his insistence that they agree to support him and furnish him shelter before the execution of the partition deeds is convincing proof of his poverty and need of material help.

In the case of Roco v. Green, 50 Tex. 483, our Supreme Court said that it was exceedingly difficult to lay down the rules for determining when the relationship of a "family," as contemplated by law, exists. The court, however, proceeded to lay down the following general rules as to what constitutes a family:

"(1) It is one of social status, not of mere contract.

"(2) Legal or moral obligation on the head to support the other members.

"(3) Corresponding state of dependence on the part of the other members for this support. (Thomp. on H. and E. §§ 45, 46, and authorities cited.)"

Justice Bonner wrote the opinion in the Roco Case, supra, in 1878. In 1880, this same justice for the same court wrote the opinion of that court in the case of Wolfe v. Buckley, 52 Tex. 641. In this latter opinion he refers to the former as follows:

"As said in Roco v. Green, 50 Tex. 490, owing to the want of appropriate legislation on this subject, we have had to decide the particular case under consideration by the aid of such rules of construction and analogy as were considered most applicable."

In this last case, the court decides that a woman can claim as a homestead a place she is using for the rearing and nurturing of the children of her stepdaughter. The court says that it appears that the children were dependent upon her for moral training and at least a portion of their support and maintenance.

The two cases reviewed by us above are referred to by Judge Key, of the Court of Civil Appeals, in the case of Bank v. Cruger, 31 Tex. Civ. App. 17, 71 S. W. 774, as follows:

"There is no conflict in the testimony, and we are of the opinion that the facts established thereby show, as a matter of law, that at the time of the attachment the levy of the attachment Miss Fannie Cruger was the head of a family, and that the property levied on was her homestead.

"Counsel for appellant contends that, as the testimony shows that the nephews and nieces alleged to constitute the family of Miss Fannie Cruger were the owners of a valuable farm, therefore they were not dependent upon her for support, and consequently she was not the head of a family; and the case of Roco v. Green, 50 Tex. 490, is relied on in support of that contention. In that case the court said: 'We deduce from the authorities the following general rules to determine when the relation of a family, as contemplated by law, exists: (1) It is one of social status, not of mere contract; (2) legal or moral obligation on the head to support the other members; (3) corresponding state of dependence on the part of the other members for this support. Thomp. Homest. & Exemp. §§ 45, 46, and authorities cited.' Notwithstanding the test there prescribed, in the subsequent case of Wolfe v. Buckley, 52 Tex. 649, the same court, in an opinion prepared by the same judge, considered as a factor in determining the question of homestead the fact that the minor children were dependent upon Mrs. Buckley for moral training, as well as for partial support and maintenance. Of course, Miss Fannie Cruger originally was under no legal obligations to support and maintain or nurture her nephews and nieces; but having taken them from their former home 20 years before the controversy in this case arose, and having undertaken to rear, train, and nurture them, and having contributed largely to their support and maintenance, undoubtedly there rested upon her a moral obligation to continue so to do, as long as they were in a state of dependence; and the word 'dependence,' as here used, is not restricted to support and maintenance—food and clothing. It is intended to include moral and mental training, and that care and nurture which would be prompted by the feelings of affection which the testimony indicates existed between this aunt and the children of her unfortunate sister. Barry v. Hale (Tex. Civ. App.) 21 S. W. 783; Smith v. Wright (Tex. Civ. App.) 36 S. W. 324.

"It is also contended that, as Miss Fannie Cruger had conveyed the property in controversy by deed to Miss Helen Cruger before appellant's attachment was levied, by reason of such conveyance Miss Fannie Cruger abandoned her homestead right. The testimony shows that, after the execution of the deed referred to, there was no change of possession; that Miss Fannie Cruger continued to occupy the property as she had before, and was so in possession of it, together with the other members of her family, including Miss Helen, the grantee in the deed, at the time the attachment was levied. As between Miss Fannie Cruger and the grantee in the deed, Miss Fannie was, at the time the attachment was levied, at least a tenant by sufferance; and this court holds that a homestead right may be predicated upon a bare right of possession, without any other title. Our views on that subject are more elaborately expressed, and the authorities in

support thereof are collated, in the case of Birdwell v. Burleson, * * * 72 S. W.. 446."

The nephews and nieces of Miss Cruger owned, as found by the Court of Civil Appeals, 574 acres of land worth $10 per acre.

The Supreme Court denied a writ of error in the case of Bank v. Cruger, supra, as well as in the case of Birdwell v. Burleson, 31 Tex. Civ. App. 31, 72 S. W. 446, supra.

In the case of Drought v. Stallworth, 45 Tex. Civ. App. 159, 100 S. W. 188, it is held that a brother and sister living together on premises owned jointly constitute a family and entitles them, under the circumstances, to the exemption. In that case, the Supreme Court denied a writ of error.

Our Supreme Court, in the case of Wilson v. Cochran, 31 Tex. 678, 98 Am. Dec. 553, holds that the homestead is the sanctuary of the family, and all its members, and not merely for the head of the family.

Other interesting cases on the constituent elements of a family are Barry v. Hale, 2 Tex. Civ. App. 668, 21 S. W. 783; Givens v. Hudson, 64 Tex. 471; North v. Shearn, 15 Tex. 175; Taylor v. Boulware, 17 Tex. 74, 67 Am. Dec. 642; Anderson v. Sessions, 93 Tex. 279, 51 S. W. 874, 55 S. W. 1133, 77 Am. St. Rep. 873.

The jury found that these three daughters had lived with their father continuously from their birth. The undisputed evidence shows that they had cared for him, not only in a material way, but in looking after his comforts and waiting on him generally. He was 83 years of age at the time of this trial. The proof shows that he was infirm. He and his daughters had been occupying this home at 1003 Washington almost a year before Smith first appeared upon the scene. We think there is just as much moral obligation on the part of children to care for and furnish a home to an aged parent as there is upon the parent to furnish a home to his minor children, or upon an aunt to look after and care for her nieces and nephews. Each of these situations is highly commendable, and our courts have uniformly encouraged them all. We think the hands of creditors should be stayed as long as this aged father is so being furnished a haven of rest by his daughters. We do not think our Constitution contemplates that he should, at this time of life and in this helpless condition, be thrown out of this home and possibly into the street. Our people themselves, as shown by their Constitution, have exhibited exactly the same solicitude for the welfare of the surviving parent and minor children. They link them together in all their exemptions and protections. Under the uniform holding of our courts, we think it unquestionable that these three daughters and their old father, situated as they were at the time of this trial, constituted a family within the meaning of our

242 S.W.—14

Constitution and were entitled to claim this property as their home.

[3] If it was a homestead, then Smith cannot now foreclose his mechanic's lien on the property. Our Constitution expressly provides that a lien of this kind cannot be foreclosed on a homestead of a family unless "the work and material are contracted for in writing." The contract in suit was oral. Our courts have, without exception, construed this provision of the Constitution most strictly in favor of the homestead exemption. We are in hearty accord with this record made by our courts, and would be the last to recommend a course which would begin to let down the bars.

[4] The jury found that Miss Theresa told Smith the property was not her homestead. In view of this finding, his counsel contend that the girls are estopped from claiming homestead. There is no merit in this contention. The facts show that these people, for almost a year prior to Smith's first visit, had used this property as a homestead; that they were so using it during all their negotiations with Smith; that Smith went to this very home and saw all the parties living there; that he, himself, referred to it as their "home." Not only so, but Smith had, at least, grave suspicions that this was the homestead of this family. He says he asked the girls about it and that they referred him to the trust company. Smith says that some one connected with the trust company told him it was not homestead and he would not find it necessary to prepare papers upon that theory. Smith saw this home in use. He should have known it was their only home, for the lot at 927 Washington and the charred remains thereon could not suffice as a home. Under facts like these, involving actual, open, and visible possession, a homestead cannot be taken, even though a statement is made denying its status as a home. This is the well-settled rule in Texas. In the case of Loan Co. v. Blalock, 76 Tex. 85, 13 S. W. 12, our Supreme Court, through Chief Justice Stayton, says:

"Every person dealing with land must take notice of an actual, open, and exclusive possession, and where this, concurring with interest in the possessor, makes it homestead, the lender stands charged with notice of that fact, it matters not what declarations to the contrary the borrower may make. * * *"

We have collated and reviewed the authorities upon this point in our opinion in the case of Bayless v. Guthrie (Tex. Com. App.) 235 S. W. 843.

Under the evidence before him, the district court should have refused to award a foreclosure of this lien as against the property at 1003 Washington street. Because of his action in awarding such foreclosure, we think the judgment must be reversed.

[5, 6] The Court of Civil Appeals over-

ruled all other assignments of error in bulk with the remark that none of them presented error. We think this court erred in overruling one of the assignments and that the case should be reversed for another trial because of the refusal of the trial court to submit certain special issues at the request of plaintiffs in error. We shall now consider these refused issues. Counsel for the girls asked the submission of the following issues:

"Requested Issue No. 1. At the time of entering into the contract for the repairs and improvements on the building at 1003 Washington street, in the city of Waco, did the plaintiff represent to the defendants that the cost of such repairs and improvements, outside of the plumbing and light fixtures, which were to be furnished by the defendants, would not exceed $6,500? Answer 'yes' or 'no.'

"In answer to requested issue No. 1, you are not to consider any extras which were thereafter placed in said building, nor that might have been added thereto, nor anything that was furnished or agreed to be furnished by the defendants, but you are to answer solely as to the original contract.

"If you answer requested issue No. 1, 'Yes,' then answer requested issue No. 2.

"Requested Issue No. 2. Did the plaintiff know at the time of his representations to the defendants that the cost of such repairs and improvements on the building at 1003 Washington street, exclusive of the things to be furnished by them, would exceed the sum of $6,500; or could he have ascertained such facts from figuring their cost, based upon the plans and specifications? Answer 'yes' or 'no.'

"Requested Issue No. 3. Did the defendants rely upon the statements or representations of the plaintiff as set forth in requested issue No. 1 at the time they made the contract with him? Answer 'yes,' or 'no.'"

The court refused to submit the issues and proper exceptions to his action were reserved. The refusal of the charges is properly before us for review.

It is the well-settled law of this state that every question of fact material to the defendant's defense as pleaded, and which finds support in conflicting evidence, should, upon request, be submitted to the jury for their determination. See Kansas City, M. & O. Ry. Co. v. Weatherby (Tex. Civ. App.) 203 S. W. 793; Hart-Parr Co. v. Paine (Tex. Civ. App.) 199 S. W. 822; Houston E. & W. T. Ry. Co. v. Lynch (Tex. Civ. App.) 208 S. W. 714; M., K. & T. Ry. Co. v. McGlamory, 89 Tex. 635, 35 S. W. 1058; Quanah A. & P. Ry. Co. v. Lancaster (Tex. Civ. App.) 207 S. W. 606.

We think this issue is the one responsible for this litigation. Every word in the record shows that the estimated and approximate cost of these improvements was of the very essence of the contract. As we have already shown, Smith, upon a pencil sketch which was the basis for the later completed plans, admits he told the girls, in February,

1918, that the cost would be less than $7,000. The girls testified that he continued to tell them that the expense involved would not exceed $6,500. The circumstances show that all parties must have had $7,000 in mind as covering this expense. The girls had to borrow the money. They arranged to get that amount. It was not until several months after the work commenced that the girls arranged for an additional $1,500, which they testified was for the purpose of paying for extras which they had agreed to furnish.

Smith admitted that he never did submit the girls a complete statement of his account until January 1, 1919. He says he submitted them a partial statement about the 1st of October, showing the $6,500 was being exceeded. The girls testified that he did do that, but they further stated that they, then and there, told Smith emphatically that they would not pay his bill for this enlarged amount. They were consistent throughout and continued to refuse to make such payment. The litigation followed.

Miss Theresa testified that she would not have entered into the contract at all if she had known it would cost $11,000, instead of $6,500. She said she was not experienced in building matters and relied on Smith's judgment. She alleged, by way of cross-action already set out near the beginning of our opinion, that Smith fraudulently made this low estimate in order to get her to enter into the contract as she did, and she asks for damages over against him by reason thereof, if it should be held that her property was liable for the payment of the amounts claimed against it by the materialmen and laborers.

This issue was clearly and abundantly raised by the pleadings and evidence. She was entitled to have it presented to the jury. Their answer could have materially affected the final judgment of the court.

It is true that the jury found that she entered into the contract on the percentage basis without limit as to amount, but that does not determine the issue now being discussed. Suppose she did do so. She practically admits that in her evidence, but says she did so relying upon the estimate given her by Smith. In one part of her testimony Miss Theresa says: "We agreed to let the contract on a percentage basis on his estimated cost."

When this cost ran up from $6,500 to $11,000, these young ladies were met with a difficult situation. They had arranged to finance the proposition on the smaller basis without endangering the home of their father and themselves. They had even, pending the final execution of the loan papers with the trust company, borrowed some $3,000 from a Waco bank, agreeing to pay it back out of the trust company loan. The loans from the bank had gone to Smith as

the work progressed, so the girls could not fill their engagements with all the creditors promptly. It will clearly appear that this large increase in the cost of the project was vital in the case and that its various phases should have been, upon request, submitted to the jury. For the refusal of the trial court to submit the three special issues heretofore set out by us, we think the judgment of said court should be reversed and the cause remanded for another trial.

For the two reasons discussed, we recommend that the judgments of the district court and Court of Civil Appeals be reversed and the cause remanded to the former for another trial not inconsistent herewith.

CURETON, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.

We approve the holding of the Commission of Appeals on the question discussed in its opinion.