## UNITED FIDELITY LIFE INS. CO. v. PLAINVIEW BUILDING & LOAN ASS'N et al.

### No. 4396.

Court of Civil Appeals of Texas. Amarillo.

April 8, 1935.

Rehearing Denied May 6, 1935.

P. B. Randolph, of Plainview, for appellant.

C. D. Russell, of Plainview, for appellees.

HALL, Chief Justice.

This suit was instituted by the appellant to recover upon a paving certificate issued by the city of Plainview to the Jordan-Hall Construction Company, and to foreclose the paving lien upon lot No. 10, in block No. 20, Highland addition to the town of Plainview. It is alleged that Mrs. Thomas, née Miss Ersula Dunaway, owned the property at the time the paving assessment was made. Her husband is joined pro forma. The Plainview Building & Loan Association and C. D. Russell, its president, were joined as defendants. It is alleged that the Plainview Building & Loan Association had previously attempted to foreclose a deed of trust lien which it held upon the property, and which lien it is alleged was inferior to and subordinate to the special assessment lien upon which plaintiff's cause of action is based.

Thomas and wife did not answer. The Building & Loan Association answered by general denial, and further alleged that it had paid certain tax assessments against the property, and by reason thereof it held a lien prior to plaintiff's special assessment lien. They sought to recover under trespass to try title, in view of the sale under the power in the deed of trust and the purchase by the building and loan association at said sale. It was contended that the property

was the homestead of Ersula Dunaway at the time the paving certificate was issued by the city of Plainview. Another contention is whether the payment of tax assessments by the building and loan association, in order to protect its indebtedness against the property, gave it a preference lien over the plaintiff's paving lien.

The case was tried to the court without a jury, and resulted in a judgment in favor of the plaintiff against Mrs. Ersula Dunaway Thomas (it having been shown that she married after acquiring the property and before the institution of the suit) for the full amount due on its paving lien. The court further decreed that as against the building and loan association the plaintiff should take nothing, and decreed that the lien of the building and loan association was prior to and superior to that held by the plaintiff. No findings of fact or conclusions of law were filed by the court.

The first proposition to be considered is as follows: It being conclusively shown by the evidence introduced in this case, and by stipulation of counsel, that all prerequisites required by law to the issuance of a valid paving lien assessment by the city of Plainview, relating to the certificate sued upon by the plaintiff herein, had been fully performed, and that the property involved in this controversy upon which plaintiff sought to foreclose its lien was not the homestead of the defendant Ersula Dunaway Thomas, at the time of the issuance of said paving certificate, the court erred in refusing to foreclose plaintiff's statutory lien against the property and in holding in favor of the defendant the Plainview Building & Loan Association. On the other hand, the appellee insists that, because the property involved in this suit was the homestead of a family, consisting of Ersula Dunaway, her father and mother, the assessment levied during their occupancy of the premises created no lien thereon, and, because the only lien plaintiff had to secure the cost of the paving was the lien executed by Ersula Dunaway, the court did not err in rendering judgment in favor of appellees.

■ The record shows that the special assessment for paving was made by the passage of the ordinance to that effect on the 6th day of May, 1929. If at that time the property involved was a homestead within the meaning of the Constitution, the attempt to fix a lien by enactment of the ordinance to secure the amount due for paving must fail.

■ The generally accepted rules to determine when a family exists, within the meaning of the Constitution relating to the homestead exemption (article 16, § 50), are: (1) It is one of social status and not one of contract; (2) there must be either a legal or moral obligation on the head to support the other members of the family; and (3) a corresponding state' of dependency on the part of the other members for this support. Roco v. Green, 50 Tex. 483; American Nat. Bank v. Cruger, 31 Tex. Civ. App. 17, 71 S. W. 784; Franklin Fire Ins. Co. v. Shadid (Tex. Com. App.) 68 S.W.(2d) 1030; Plough, Inc., v. Moore (Tex. Civ. App.) 56 S.W.(2d) 681; H. P. Drought & Co. v. Stallworth, 45 Tex. Civ. App. 159, 100 S. W. 188; 22 Tex. Jur. pp. 38, 40, and 41, §§ 37 and 23.

■ Where the record shows that the social status exists, as in the case of an adult child and parents, the evidence must show that the parent was dependent upon the child for support or care. 22 Tex. Jur. p. 43, § 25; Barry v. Hale, 2 Tex. Civ. App. 668, 21 S. W. 783.

■ The testimony bearing upon this issue comes from Mrs. Ersula Thomas and her father, W. J. Dunaway. She testified that she traded for this property, which is designated in the testimony as the "home on Eleventh Street," on August 30, 1928, and was living there with her mother and father when the assessment was made in May, 1929; that she was the only one of her parents' children with them; that, when they moved to Eleventh street, she commenced working at the A L & K Dry Goods Store, where she worked for three years at $60 per month; that her mother's health was very bad; in fact, she was helpless for a long time prior to the time they moved to the Eleventh street home; that, while her mother was able to be up a part of the time, she was not able to do any work, and that her father took care of her mother; that her mother and father had no other home during that time, and she bought the groceries and supplies for the family. She further stated that her father had 320 acres of land at that time near Spring Lake, upon which the Federal Land Bank had made a loan; that her brother occupied 160 acres, and the remainder of the land was leased to various tenants; that her father did not spend much of his time with his sons, and while the mother lived he stayed at home; that he spent the last two winters at San Antonio; that he obtained some rent from the farm while he

lived on the Eleventh street place with her; that he was rather an able-bodied man; that one brother paid the father some money when he occupied the half section of land, which was three or four years ago. She further testified that while they lived in the Eleventh street home she bought all the groceries, made payments on the home, and made one payment on the paving debt, but had to borrow the money to do that; that her salary was $60 a month, and the monthly payments on the house amounted to $42.68; that she paid the insurance for two or three years, but did not remember how much; that one of the boys gave her $80; that with the little balance she had left of her salary she bought groceries, and what she lacked she borrowed from Tom and made a note for it; that after her mother's death they used some of the insurance money, which was received, in the support of herself and father; that her father let her have $80 to make the payment on the house; that he never lived on the farm, but stayed at her home and took care of her mother; that her mother died in October either three or four years ago; that her father had no other property than the farm in Hale county.

W. J. Dunaway, the father, testified that he lived at West Eleventh street, and was living there the first part of the year 1929 with his wife and daughter, Mrs. Thomas. He stated that Mrs. Thomas paid the bills and living expenses; that he left her to see about everything. When asked if he contributed anything to the support of the family, he said he did. That during the year 1929 he received various sums from his son, Grady. That he and his wife sold Grady 160 acres of the farm with the understanding that Grady would pay them money as it was needed. That the 160 acres was in Castro county. That the deed was made to Grady about four years ago, and prior to the death of Mrs. Dunaway. That they sold the land to Grady at $30 an acre, or a total of $4,600, but took no notes for the amount. That Grady paid $227.50, but he could not give the date. That he paid $20 in 1929, and again he paid $50 and $30. That the $30 was paid in 1927. He also paid $25 in 1927. That all told, between 1927 and 1930, Grady had paid $1,414.80. That the understanding with Grady was that he was to pay only as they needed the money, and when it was called for. When asked what he did with the money he received from Grady, he said he did not deposit it in any bank after the First National Bank failed. That according to his recollec-

tion and memoranda he received $227.50 cash in 1927, another $200 in 1927, $20 cash in 1927; two payments, one of $50 and one of $30, in 1927; $256 cash in 1927; $34.35 cash in 1927; $71 cash and $50 in rent which he collected and did not turn over to Grady in 1928. That in 1929 he received $212 cash, $63 cash, and $50 cash. When asked what he did with the money he collected, he said, "Paid my running expenses." He was then asked:

"Q. Well, did your daughter pay your expenses for you, or did you pay them? A. Well, I couldn't say whether I gave her the money to pay them or whether I paid them myself.

"Q. Well, those grocery bills she paid, did she pay those out of her money or out of yours? A. Well, I couldn't say what she did with the money, or whether I paid the bills or not, but she has been paying these bills out of my money.

"Q. She used your money in paying bills? A. Yes, sir.

"Q. She paid on the house out of your money, or her money? A. I think I gave her $80.00 to pay two months. She didn't have the money and I let her have $80.00 of my own money to pay on her house.

"Q. Have you had any other means of support outside of the money you got from your son? A. I have been collecting rents on the Lubbock farm of 535 acres which I have owned for 15 years. I also had 320 acres in Castro County.

"Q. Did you collect any rent from the Castro County land? A. One year I got $424.00; three years ago, I think.

"Q. During the year 1929, did you collect any rents? A. Yes, sir. I have collected rents from it ever since I have owned it.

"Q. And did you collect any rents at Lubbock during 1929? A. Yes sir, but I can't say approximately how much. It would amount to more than $100.00. I had three different men on the place. It probably ran $300.00 the year Mr. Atwell was on the place. I can't say about the other two men. One year I waived my lien for the tenant to borrow money. * * * Mrs. Dunaway died three years ago the 23rd of last October. There was an insurance policy on her life for $1,000.00. This was obtained after 1929.

"Q. State, Mr. Dunaway, whether you have ever at any time depended upon Miss Ersula for support? A. No, not for support.

"Q. Are you helpless in any way? A. Helpless?

"Q. Yes, sir. A. No, sir.

"Q. Have you ever been helpless? A. Never had but one spell of sickness in my life.

"Q. You have been a pretty active man all your life? A. Yes, sir, all my life.

"Q. Are you still pretty active? A. Can do more work than any child I have got. They say I can. I don't know. * * * My wife was in pretty bad condition when we moved to the Eleventh Street property.

"Q. About all you could attend to then was looking after her? A. It was all I did do. At that time we lived with daughter and made our home there."

Even if this testimony was sufficient to show a legal or moral obligation resting upon Mrs. Ersula Thomas to support her mother or father—and this is doubtful—it nevertheless, in our opinion, is insufficient to show a corresponding state of dependency on the part of the parents, or either of them, upon Mrs. Thomas. Because the evidence is insufficient to sustain the judgment in this particular, it will have to be reversed.

■ Only one other proposition remains to be disposed of. The deed of trust above mentioned provides, among other things, that the owners of the property will pay, before the same becomes delinquent, all taxes and assessments that may be levied within the state of Texas upon said premises, or any part thereof, and, if they fail to do so, appellee or other holder of said note, at its option, may pay such taxes, and the sum expended shall become a part of the debt secured by the deed of trust. The deed of trust further empowered the trustee, upon the application of the holder of the note, to sell the property if default was made in the payment of the debt, or if any agreements therein contained are breached.

C. D. Russell, as trustee in the deed, upon default advertised the property and sold it in payment of the note due in the sum of $3,-200. The notice advertising the property is not contained in the record, and the trustee's deed does not recite that the sale was made for the purpose of reimbursing the company for the taxes which it had paid. The contention made in connection with this matter is that because the building and loan association paid the taxes under the above-quoted provisions of the deed of trust, it was subrogated to the tax liens existing in favor of the state, county, municipality, etc., and, having purchased the property at the trustee's sale, they acquired the superior title. While this is the rule in some jurisdictions, the law is otherwise in this state.

In the case of Littlefield et ux. v. Scott (Tex. Civ. App.) 244 S. W. 824, it was held that, when a mortgagee pays taxes on land mortgaged, the amount so paid becomes part of his debt against the mortgagor, secured to the same extent as the items originally secured by the mortgage, citing Stone v. Tilley, 100 Tex. 487, 101 S. W. 201, 10 L. R. A. (N. S.) 678, 123 Am. St. Rep. 819, 15 Ann. Cas. 524. A writ of error was refused by the Supreme Court.

If it may be implied from the judgment of the court that it is based upon the fact that the building and loan association by paying taxes acquired the tax lien, and a sale under the trust deed authorizing the company to pay such taxes vested in the company the superior lien evidenced by the taxes, this was error.

For the reasons stated, the judgment is reversed, and the cause remanded.

MARTIN, J., disqualified; not sitting.