Gordon Morehead, etc., *et al.*, v. W. W. Yongue

183 So. 804.
Opinion Filed September 27, 1938.
Rehearing Denied October 31, 1938.

*H. M. Hampton,* for Appellants;
*C. A. Savage, Jr.,* for Appellee.

Buford, J.—W. W. Yongue, a single man, acquired title to certain property in 1932 at which time there were outstanding against him certain judgments. Afterwards execution was levied on the real estate. Yongue, on September 25th, 1936, filed bill to enjoin sale, claiming the property as homestead and, therefore, exempt from forced sale.

McNab answered the bill and in paragraph 1 and 2 thereof alleged:

"Defendant denies that the property involved herein constitutes or has ever constituted the homestead of the plain-

tiff, and says that the same is subject to forced sale under the executions and judgments referred to.

"Defendant admits that the plaintiff undertook to have his property set off and to have his homestead designated, but specifically denies that the same amounted to such designation, and charges that the same was a fraud upon the court and upon the rights of this defendant, because the said property never constituted the plaintiff's homestead, and plaintiff was not at said time a married man and has never had a homestead in Marion County, and that the charge that the same is a homestead is a subterfuge to try to avoid the payment of his just debts.

"Defendant therefore denies that the same would constitute a cloud on his title, but charges that a sale under said judgments will constitute a sale of the said property and vest in the purchaser the legal title thereto."

In the final decree the Chancellor said: "that continuously since plaintiff acquired his interest in said property, hereinafter described, and continuously for the last past ten or twelve years, that plaintiff, W. W. Yongue, has been the head of a family, consisting of his mother and father, prior to his marriage, and his mother, father and wife since his marriage, until his mother's death, and since her death consisting of his wife and father; that they were dependent on him for support and he did support them, or some of them, continuously during said period of time, and that the judgments hereinafter designated and described have never been a lien on the real estate and homestead property of plaintiff, hereinafter described;"

The record shows that Yongue was married on August 1st, 1936.

The record shows the following testimony by Yongue, upon which Yongue relied as basis of his claim of homestead exemption against forced sale:

"Q. Mr. Yongue, your deed filed in evidence as Exhibit No. 1 is dated the 26th day of February, 1932, and your married August 1, 1936, prior to your marriage, did you have anyone depending upon you for support?

"A. Yes.

"Q. You have previously testified that you supported your mother and father for the last ten years, up until the date of your mother's death and since that time you have supported your father, please state briefly what you did in the way of supporting your mother and father, say from the first of January, 1932, and up until the date of your marriage?

"A. I supplied them with groceries at their home and kept up the place they lived on.

"Q. Were you their sole means of support?

"A. Yes.

"Q. Did anyone contribute toward their support but you?

"A. No.

"Q. Where did you buy the groceries for them usually?"

"A. Scott's store.

"Q. That at Ocklawaha, Florida?

"A. Ocklawaha, Florida.

"Q. They were both solely dependent upon you for support, and you were their sole means of support all that time?

"Q. Yes, I paid all their doctor bills too.

"Q. Is your father able to attend this hearing today?

"A. He isn't, he is in a very bad condition.

"Q. You mean he is sick physically and unable to attend?

"A. Yes.

"Q. Are you still supporting him?

"A. Yes.

Re-cross examination by H. M. Hampton, Attorney for Defendants:

"Q. When did your mother die?

"A. March 18, of this year.

"Q. Is your father still iving?

"A. Yes.

"Q. Where is he living?

"A. On mother's place.

"Q. On your mother's place?

"A. Yes.

"Q. Where did your mother live before she died?

"Q. On her place.

"Q. In other words, they lived on the place at Ocklawaha?

"A. Yes.

"Q. Did they ever live on the land involved in this suit?

"A. No."

The evidence failed to establish the homestead character of the property prior to Yongue's marriage. The judgments constitute liens on the property before it acquired the status of a homestead and, therefore, it was not exempt from sale under exemption based on such judgments. Pasco v. Harley, *et al.,* 73 Fla. 819, 75 Sou. 30; Lyon v. Arnold, Fed. (20) 451.

The record shows that Yongue's father and mother never resided on the property involved, but lived in a separate home belonging to his mother. That house belonging to Yongue's mother was the homestead of the parents of Yongue. Yongue resided on the property involved here before he purchased the one-half interest in it and continued to reside thereon until the present time. But the showing is insufficient to show that he was the head of a family entitled to claim this property as homestead exemption until he married in 1936.

While the record shows that Yongue supported his parents, it fails to show that he was the head of a family. He did not live with his parents. They had the home where they lived and he established his home away from his parents on the land involved.

In the case of Johns v. Bowden, *et al.,* 68 Fla. 32, 66 Sou. 155, this Corut defined the conditions necessary to constitute one the head of a family, which definition was approved in Whiddon v. Abbott, *et al.,* 124 Fla. 293, 168 Sou. 253, as follows:

"To constitute a 'head of a family' there must be at least two persons who live together in the relation of one family, and one of them be 'the head' of that 'family.' When the natural relation of husband and wife or parent and child, or that of being *in loco parentis* does not exist, the relation should be one in which an established and continuing personal authority, responsibility and obligation actually rests upon one as 'the head of a family,' for the welfare of the others, who in law should or in fact do recognize and observe a family relation to the one as 'the head of a family.' "

It follows that the decree msut be reversed and the cause remanded for further proceedings.

So ordered.

Reversed.

WHITFIELD, TERRELL and BROWN, J. J., concur.

ELLIS, C. J., and CHAPMAN, J., dissent.

CHAPMAN, J. (dissenting).—This cause is here on appeal from a final decree dated January 5, 1938, made and entered by the Circuit Court of Marion County, Florida. The material portions of the final decree are: First, the decree permanently enjoins or restrains the Sheriff of Marion County, Florida, from selling at Sheriff's sale certain described lands claimed as a homestead under execution on

two judgments owned by George B. McNab. One judgment is in favor of the plaintiff in the suit of Franklin Paint Company v. W. W. Yongue, trading as Yongue's Poultry Farm, and obtained on February 4, 1926; the second judgment in favor of the plaintiff in the suit of Gulf Fertilizer Company v. W. W. Yongue, obtained on September 1, 1927; each of these judgments being recorded among the public records of Marion County, Florida. The record is silent as to assignments of the aforesaid judgments to George B. McNab, defendant below. Second, the judment recorded in the Minutes of the Circuit Court, Book "W," page 319, being the case of Franklin Paint Company v. W. W. Youngue, "is hereby cancelled and satisfied of record and the Clerk shall note the cancellation thereof on the margin of the record where judgment is recorded."

The first question for determination is whether the right to homestead exemption is superior to or subject to the lien impressed upon the property by the rendition of the judgment and the levy of the execution issued thereon before the acquisition of the right to homestead exemption in the property. Second: from the evidence adduced was the lower court justified in finding or decreeing that the said judgments, *supra,* or either of them, had been paid? The parties to this suit will be referred to in this opinion as they appeared in the lower court as plaintiff and defendant.

Consideration will be given to the questions here for determination in reverse order in which they are stated *supra.* "From the evidence adduced, was the lower court justified in finding or decreeing that the judgments, *supra.* or either of them, had been paid?" The plaintiff acquired deed to the homestead on February 26, 1932, and was on June 25, 1935, by the Clerk of the Circuit Court of Marion County recorded in Deed Book No. 224 at Page 542. The plaintiff was 39 years of age and on August 1, 1936, married Willa

K. Funnell at Inverness, Florida. The plaintiff lived all of his life near Ocklawaha in Marion County, Florida, and the land is located in the same county. The record, on page 20, shows: Questions by Mr. Savage: "Q. Mr. Youngue, there is a judgment of record in Marion County in the case of Franklin Paint Company versus W. W. Youngue, recorded in Minutes of Circuit Court 'A' page 319, judgment having been rendered in the Circuit Court of Marion County, Florida, on February 3, 1926. Please state whether you are the W. W. Youngue named in that judgment? A. Yes. Q. Have you ever paid that judgment? A. Yes. Q. When and to whom did you pay this judgment? A. C. A. Savage in August, 1929." On pages 28 and 29 of the record is the testimony of C. A. Savage, Jr., viz.:

"In the case of Franklin Paint Company versus W. W. Youngue, in which case final judgment was rendered against W. W. Youngue in the Circuit Court of Marion County, Florida, and there appears of recard in Minutes Circuit Court Book 'W,' page 319, I was the attorney for Franklin Paint Company, a corporation, and obtained said judgment. After said judgment was obtained, the same was fully paid and satisfied by W. W. Youngue. As I recall it a levy was made on some of Mr. Youngue's property and after the levy was made the judgment was fully paid. On August 24, 1929, I transmitted to Franklin Paint Company my check in full satisfaction and payment of said judgment, less my fee and the incidental costs of suit. I have made a thorough search of my old records to find the cancelled check, but all of my checks, as far back as 1929, have either been lost or destroyed, but I have my original check book with the stubs in it showing; the stub of the check mailed to the Company, and I now offer said original check book and said stub in evidence as plaintiff's Exhibit Number 2. I know the Company received the check, because

had it not received the check my bank balance would have shown that fact, and all my records show that the check was received and paid and the judgment paid in full. I recall that part of the judgment was paid by a levy and sale of real estate and the balance paid in cash."

The lower court ruled correctly in holding that the judgment of the Franklin Paint Company had been paid and ordering the same cancelled of record. In the case of Farrington v. Harrison, 95 Fla. 769, 116 So. 497, this Court said:

"We also bear in mind the oft reiterated rule that while the findings of the Chancellor on the facts where the evidence is heard by him, and the witnesses are before him, are entitled to more weight in the Appellate Court than where such findings are made in a cause where the testimony was not taken before the chancellor, yet in either case the Chancellor's findings should not be disturbed by an Appellate Court unless shown to be clearly erroneous. Sandlin v. Hunter Co., 70 Fla. 514, 70 South. Rep. 553; Travis v. Travis, 81 Fla. 309, 87 South. Rep. 762; Lucas v. Wade, 43 Fla. 419, 31 South. Rep. 23.

On the other hand, where a decree is manifestly against the weight of the evidence or contrary to and unsupported by the legal effect of the evidence, then it becomes the duty of the Appellate Corut to reverse such decree. Carr v. Leslie, 73 Fla. 233, 74 South. Rep. 207; Florida National Bank v. Sherouse, 80 Fla. 405, 86 South. Rep 279; Gill v. Chappelle, 71 Fla. 479, 71 South. Rep. 836; Lightsey v. Washington Park Properties, 112 South. Rep. 555."

The other question for determination is: "whether the right to homestead exemption is superior to or subject to the lien impressed upon the property by the rendition of the judgment and the levy of the execution issued therein before the acquisition of the right to homestead exemption

in the property." The plaintiff married on August 1, 1936, and after marriage he and his wife lived as husband and wife on the land against which execution was directed. The lower court decided one of the said judgments had been paid and directed it to be cancelled of record. The remaining judgment is that of the Gulf Fertilizer Company dated September 1, 1927. It is asserted that the judgment lien *supra* attached to the land in question on the date plaintiff obtained a deed to said land, which was February 26, 1932. The land here is subject to the writ of execution unless, as the plaintiff contends, he was the head of a family residing in this State, within the meaning of Section 1 of Article X of the Constitution of the State of Florida, and for said reason the land is exempt from forced sale. The land was advertised for sale on September 7, 1936, by the Sheriff of Marion County, Florida, and on September 25, 1936, a restraining order issued upon application of plaintiff.

The evidence shows, and it is not disputed, that the plaintiff was in possession of the land in question and claimed ownership of a one-half undivided interest therein from February 26, 1932, to September 25, 1936, when he filed the bill of complaint here and the restraining order issued. The evidence about plaintiff being the head of a family is: He testified that he had supported his father and mother for 10 or 12 years prior to the year 1937, which was from the years 1925 or 1927 to the year 1937. His father was 79 years of age while his mother was 78, and she died on March 18, 1937: "I supplied my parents with groceries at their home and kept up the place they lived on. I was their sole means of support and no other person contributed to their support. I usually bought the groceries at Scott's store at Ocklawaha and likewise I paid all their doctor bills." The parents were not physically able to work and earn a living—they lived on his mother's place at Ockla-

waha, but not on the land involved in this suit. Plaintiff testified that the involved land was in one contiguous body and that he had lived on the said property for approximately 18 years when he worked for F. P. Herr until February, 1932; that the place he worked on was some distance from where his father and mother lived, but it is a clear inference that with the money he earned while working as a laborer for Dr. Herr he supported his father and mother. It-was impossible for him to live in the home with his father and mother and be able to support them, but from necessity was forced to leave home, seek employment, work out the money, and in this manner supply his aged parents with the common necessities of life, which is undisputed here. He did this continuously for 10 or 12 years prior to the filing of this suit. The exact distance from his mother's place to where plaintiff worked and earned a living for himself and aged parents was not clearly developed by the testimony.

In the case of Osceola Fertilizer Co. v. Sauls, 98 Fla. 339, 123 So. 780, in a concurring opinion filed by Mr. Justice WHITFIELD, it was said:

"The question presented is whether the complainant is 'the head of a family' within the meaning of the homestead exemption article of the Constitution. It appears that for a long period prior to the time when the judgment was obtained, husband, wife and children had lived on the country place as the family home, but when the judgment was rendered the family were residing in nearby town so the children could attend school, the husband at all times attending the home place to support the family therefrom; while the family were residing in town and the husband on the country place, two children married and moved away; husband and wife were divorced and the minor child was awarded to the custody of the mother. It is alleged

that the father had continuously resided on the home place and that 'he has continuously supported his said family therefrom * * * and is supporting his said wife and child at the time of the filing of this bill of complaint.' Whatever may be the father's duty by order of court or otherwise to contribute to the support of the divorced wife, it is the father's duty to support the minor child and as to such minor child he is still the head of the family; and the award of the custody of the minor child to the custody of the mother does not change the relation of the father to his child even if he bé not at any time awarded its custody. Under the circumstances of this case the father remains the head of the family of which the minor child is a member, even though for its welfare it is now in the custody of its divorced mother. The father's obligations to the child continue and the family home may be preserved for the father and minor child. The absence of the minor child from the father's home is decreed by law for her welfare and is not from her intent to sever the family relation to her father.

"This holding is not regarded as being in conflict with the decisions on the facts in Herrin v. Brown, 44 Fla. 782, 33 So. R. 522, 103 Am. St. Rep. 182; Johns v. Bowden, 68 Fla. 32, 66 So. R. 155; and Murphy v. Farquhar, 39 Fla. 350, 22 So. R. 681, and other Florida cases."

Who is the head of a family within the meaning of Section 1 of Article X of the Constitution of Florida exempting homesteads from forced sale, must be ascertained from the *facts of each case;* and there is no invariable test based solely upon dependents, and especially legal dependents. See DeCottes v. Clarkson, 43 Fla. 1, 29 So. 442; Jetton Lumber Co. v. Hal 1, 67 Fla. 61, 64 So. 440, 51 L. R. A. (N. S.) 1121; Hill v. First Nat. Bank, 73 Fla. 1092, 75 So. 614.

To constitute a "head of a family" there must be at least two persons who live together in the relation of one family, and one of them must be the head of that family. See Johns v. Bowden, 68 Fla. 32, 66 So. 155; Johns v. Bowden, 68 Fla. 32, 66 So. 155; Johns v. Bowden, 72 Fla. 530, 73 So. 603.

Organic and statutory provisions relating to homestead exemptions should be *liberally* construed in the interest of a family home, but the law should not be so applied as to make it an instrument of fraud or imposition upon creditors. Milton v. Milton, 63 Fla. 533, 58 So. 718; Jones v. Carpenter, 90 Fla. 407, 106 So. 127, 43 A. L. 1409; Read v. Leither, 80 Fla. 574, 86 So. 425.

By a liberal construction or interpretation is meant that the words should receive a fair and reasonable interpretation, so as to attain the objects for which the instrument is designed and the purpose to which it is applied. We do not mean that the words should be forced out of their natural meaning. See Lawrence v. McCalmont, 2 How. (U. S.) 426, 11 L. Ed. 326.

Liberal means free in giving; generous; not mean or narrow minded; not literal or strict. See Bouvier's Law Dictionary, Vol. 2, p. 1964.

In the case of In Re: Morrison, 110 Fed. 734, in considering "the head of a family," it was said:

"* * * The term 'head of a family' should be given a broader construction than merely applying it to the husband or father, and, while it is true that there is some conflict of authority as to whether an unmarried man can be the head of a family, the weight of authority is in favor of considering every person the head of a family who keeps house, and has living with him and is supporting some persons whom it is either his legal or moral duty to support. Harbison v. Vaughan, 42 Ark. 539. Thus, in Tennessee,

Chancellor Cooper, in *Ex parte* Brien, 2 Tenn. Ch. 33, held that a widow keeping house upon the farm without any children of her own, but with orphan children of a deceased sister, dependent upon her, is the head of a family, within the meaning of the homestead laws of that state, which is limited to the head of a family. To the same effect, see, among other decisions, Marsh v. Lazenby, 42 Ga. 153; Blackwell v. Boughton, 56 Ga. 390; Cox v. Stafford, 14 How. Prac. 521; Connaughton v. Sands, 32 Wis. 387; Wade v. Jones, 20 Mo. 75, 61 Am. Dec. 584; Parsons v. Livingston, 11 Iowa 104, 77 Am. Dec. 135; Seymore v. Cooper, 26 Kan. 539; McMurry v. Shuck, 6 Bush 111, 99 Am. Dec. 662; Moyer v. Drummond, 32 S. C. 165, 10 S. E. 952, 7 L. R. A. 747, 17 Am. St. Rep. 850; Thomp. Honest & Exemp. Secs. 55-60. Even if there be no statutory obligation, there is a moral obligation on the bankrupt to support his old widowed mother, which is sufficient, according to these authorities, to constitute him the head of a family within the meaning of the provisions of the Constitution of Arkansas. It may be that the filial affection of the bankrupt for his mother may have prevented him from marrying. To take from him his home would deprive his aged mother and young brother of a shelter, and defeat the beneficent intention of the framers of our Constitution. Earning but scant wages as a fireman, his actions in thus furnishing a home for his mother and brother and contributing to their support are commendable, and, in the opinion of this court, constitute him the 'head of a family,' within the true meaning of the Constitution of the state of Arkansas * * * "

In the case of Bailey v. Cummings, 2 Fed. Cas. (Mo.) p. 367, No. 773, the court held a bachelor "the head of a family" under circumstances, viz.:

"C., a bankrupt, was a bachelor, and from 1853 lived on a farm with a sister, who furnished the money for its purchase and improvement. The brother and sister furnished money and labor in unequal proportions. Another sister, an invalid, formed part of the household until her death, in 1861. In 1869, the surviving sister married. In 1872, after her husband's death, she returned to the home of the bankrupt, and made it her home, having her furniture there; but, her health being poor, she visited much of the time in the east, and also with brothers in the neighborhood. In 1876, C. was declared a bankrupt and afterwards the sister returned to the farm. She was in charge of the household and domestic affairs at the farm, and paid no board. *Held,* that she was part of the bankrupt's family, and that he was entitled to an exemption as the 'head of a family' under the Missouri homestead exemption laws."

"Unmarried persons" as the head of a family in 29 Corpus Juris, pages 797-8, viz.:

"Under the statutes restricting the right to the head of a family or to a householder or housekeeper with or having a family, an unmarried man is not entitled to homestead exemption if there is no one dependent upon him whom he is legally or morally bound to support; but it is otherwise if he maintains a home and supports persons who are dependent upon him, and whom he is under such a duty to support, as a father, mother, sister, illegitimate child, or the like. The same rules apply in the case of an unmarried woman. She is not entitled to a homestead as a head of a family or a householder or housekeeper with or having a family, if she has no person living with her who is dependent upon her for support and whom she is under a legal or natural duty to support; but it is otherwise if she has living with her and supports such a person, as a mother, an illegitimate minor child; or the like."

"Dependents Generally," 13 R. C. L., par 13, pages 554-5, viz.:

"* * * So it has frequently been held that a bachelor or a widower who ocupies a house as a head of a family, on land which he desires to set apart as a homestead, who has living with him a mother, father, sisters or brothers, who are dependent upon him for support, and where there is a corresponding duty of support resting on him, may properly be regarded as a householder having a family, within the meaning of the statute. In some cases, however, it has been held that the family relation does not exist where the dependent members are not residing with the debtor * * * "

In the case of Sheehy v. Scott, 128 Iowa 551, 104 N. W. 1139, 4 L. R. A. (N. S.) 365, a number of important decisions bearing on a "homestead" may be found, viz.:

"Family" defined:

"1. In Rosco v. Green, 50 Tex. 488, the court says: 'We deduce from the authorities the following general rules to determine when the relation of a family, as contemplated by law, exists: (1) It is one of social status, not of mere contract; (2) legal or moral obligation on the head to support the other members; (3) corresponding *state of dependence* on the part of the other members for this support.'

"2. The family, within the meaning of the homestead law, consists of those members of the household who *are dependent* upon the householder for support, or to whom the householder owes some duty. Brokaw v. Ogle, 170 Ill. 115, 48 N. E. 394.

"3. To constitute such (single men), a family, there must be a *condition of dependence,* and no mere aggregation of individuals will create this relation. Nor can the circumstance that a family exists elsewhere have·any ma-

terial influence on the case.  Abercrombie v. Alderson, 9 Ala. 981.

"4.  To constitute a family, within the meaning of the Act, the relation of parent and child, or that of husband and wife, must exist; there must be a condition of dependence on the one or the other of these relations; *but it is not necessary that all the dependents should live under the same roof, or that the family should live together;* it is the relation and the dependence on that relation, not the aggregation of the individuals, that constitutes a family.  Sallee v. Waters, 17 Ala. 482.  (Emphasis supplied.) * * *

"Single Persons" defined:

"And a son supporting his mother and others in the family is held to be the head of a family.  This was held under Wis. Rev. Stat. Chap. 134, Sec. 32, subdivs. 8, 9, exempting personal property of the debtor and his family.  Connaughton v. Sands, 32 Wis. 387. * * *

"2.  And this was held under S. C. Const., allowing exemption of property to one who is the head of the family. Scott v. Mosely Bros., 54 S. C. 375, 32 S. E. 450.  The court said: 'While a husband is the head of a family, a son, who *takes care of and protects a widowed mother,* may also be the head of a family of which such mother is a member."

"3.  An adult son occupying jointly a flat in the city with his mother and adult brother, *paying the rent* and household expenses, was held to be the head of a family of which his mother was the other member.  State use of Smythe v. Kane, 42 Mo. App. 253.  The court said: 'The man who controls, supervises, and manages the affairs of a household consisting of several members of a family is the head of a family, even though he be neither husband nor father.'

"4.  An unmarried man *contributing* to the support of his mother, sisters, and brothers, who resided with him on

the land, was held to be the head of a family. Broyles v. Cox, 153 Mo. 242, 77 Am. St. Rep. 714, 54 S. W. 488.

"5. An old bachelor having a mother and two sisters, all of age, living in the same house with him, and providing for them for years, was held to be the head of a family. Marsh v. Lazenby, 41 Ga. 153. The Court said: 'A husband, a widow, a guardian or trustee, who represents those who are dependent upon him or her for a support, and is the head of a family of such dependents, is entitled to a homestead; and we see no reason why the same rule does not apply in favor of the head of any other household of dependents whom it is his legal duty to support.' * * *

"6. And a bachelor *taking care* of his widowed sister, who made his house her home, having her furniture there and a room furnished, but visiting relatives, was held to be the head of the family, under Wagner's (Mo.) Stat. p. 603, giving a homestead to each housekeeper or head of a family resident in the county. Bailey v. Comings, 16 Nat. Bankr. Reg 382. * * *

"7. And a sister *supporting her sister* is held to be the head of a family. Chamberlain v. Brown, 33 S. C. 597, 11 S. E. 439.

"And an aunt *supporting nieces* or nephews is held to be the head of a family.

"8. So, an unmarried woman, undertaking to support and train her nephews and nieces, whose mother was insane, was held to be the head of a family notwithstanding the children owned property. American Nat. Bank v. Cruger, 31 Tex. Civ. App. 17, 71 S. W. 784. This was on the ground that, having undertaken to rear, train and nurture them, and having contributed largely to their support and maintenance, undoubtedly there rested upon her a moral obligation to continue to do so, so long as they were in a

*state of dependence;* and the word 'dependence,' as here used, was not restricted to support and maintenance—food and clothing. It was intended to include moral and mental training, and that care and nurture which would be prompted by the feeling of affection which the testimony indicated existed between this aunt and the children of her unfortunate sister." (Emphasis supplied.)

In the determination of this case let us not consider the moral or legal obligation resting on the plaintiff below to provide, as he has done here, food, clothing and medical attention for 10 or 12 years, and the numberless things he has done for his parents, only, which a devotion and deep affection for his parents would suggest. These traits of character should not be penalized by decreeing his home to be sold under the execution here. It was not the intention of the framers of the Constitution to destroy the "head of a family" by selling the shelter over his head, but was to give to the "head of the family" property that could not be sold on execution. We can see by the evidence that he worked on the homestead here and obtained the money with which to support his aged parents. Similar cases exist today throughout Florida. If a liberal construction is given the term "head of a family" and thereby consider the spirit and meaning of this portion of the Constitution, we are forced to the conclusion that the lower court's decree should be affirmed.

ELLIS, C. J., concurs.