113 So.2d 603 (1959)
In re ESTATE of Anna Z. KIONKA, Deceased.
Robert E. TRAPP, Lloyd F. Kruckemyer, and Albert H.D. Besalski, as the President, Secretary, and Pastor, respectively, of the Congregation of Trinity Evangelical Lutheran Church of Orlando, Florida, Appellants,
v.
Margaret Ann HEBBARD, and Walter R. Ziegler, Executor of the Last Will and Testament of Anna Z. Kionka, Appellees.
No. 1039.
District Court of Appeal of Florida. Second District.
July 1, 1959.
*604 Sanders, McEwan, Schwarz & Mims, Orlando, for appellants.
Bishop & Bornstein, Orlando, for appellee, Margaret Ann Hebbard.
Stephen R. Magyar, Orlando, for appellee, Walter Ziegler.
MOODY, JAMES S., Associate Judge.
The appellee, Margaret Ann Hebbard, filed her petition in the County Judge's Court of Orange County for the determination of the homestead status of certain property owned by Anna Z. Kionka, deceased, at the time of her death. The appellants, Robert E. Trapp, Lloyd F. Kruckemyer, and Albert D. Besalski, as President, Secretary, and Pastor, respectively, of the Trinity Evangelical Lutheran Church of Orlando, Florida, and the appellee, Walter R. Ziegler, as executor of the last will and testament of Anna Z. Kionka, filed answer. From the order of the County Judge determining said property to have homestead status, the appellants filed this appeal.
The evidence in this case showed that Hans C. Kionka and wife, Anna Z. Kionka, in 1948, requested Mr. Kionka's niece, Rose Marie Gaertner, a registered nurse, 28 years of age, residing in Germany, to come to this country to live with them in their household as a member of their family. The Kionka's had no children of their own although they *605 had previously legally adopted Margaret Ann Hebbard, petitioner below, in 1918. Mrs. Hebbard had subsequently married and had been residing elsewhere for a number of years. Rose Marie Gaertner came to this country in January, 1950, took up residence with the Kionkas in their home as a member of the family in New Jersey and attended a vocational training school for further training. In June of 1951 the Kionkas moved to Florida and bought the property in question in their joint names. Rose Marie and the Kionkas lived together on said property until the death of Hans C. Kionka on October 29, 1951. Thereafter Mrs. Kionka, being the sole owner of the property, continued to live there with Rose Marie until her death in December 1957. Rose Marie worked as a practical nurse in New Jersey until she moved to Florida and then obtained a similar position at the Florida Sanatorium in Orange County.
During the times involved the parties lived together as one family group with Hans C. Kionka the head of the group. After his death Rose Marie and Anna Z. Kionka continued to live together on the property in question as a family group with the latter exercising controlling authority. Rose Marie was allowed to keep her earnings both in New Jersey and in Florida without having to pay any sums for room and board. Immediately after Mr. Kionka's death, Mrs. Kionka became in poor health so Rose Marie no longer worked outside the home and spent her time caring for Mrs. Kionka. She was paid a specified amount each week for her services although she could have earned more outside the home. During this period of time, Rose Marie gave birth to an illegitimate child which was named after a deceased son of Mrs. Kionka who expressed great love for the child. Mrs. Kionka's health gradually failed and for the last several years of her life she was more or less an invalid unable to care for herself or her affairs. Active management of her affairs was taken over by her brother and later executor, Walter R. Ziegler, and Mr. Stephen Magyar, her attorney, who had drawn her will. Mr. Magyar paid the bills and treated Rose Marie as any other employee, there being evidence that this was deemed advisable because of the jealousies that arose between Rose Marie and other nurses called in to assist in the care of Mrs. Kionka.
Mrs. Kionka died testate on September 24, 1957, leaving the bulk of her estate to Margaret Ann Hebbard, devising the sum of $5,000 each to Rose Marie Gaertner and her son, Karl Fredrick Gaertner, and devising the property in question to the Trinity Evangelical Lutheran Church of Orlando, Florida, for the purpose of establishing a memorial in the name of her deceased husband. The will was probated and in June of 1958 Rose Marie filed a claim for herself, and for her son, respectively, each in the amount of $5,000 alleging under oath that it would appear the assets of the estate would be insufficient to pay the legacies in the will, that such legacies were based upon valuable consideration, namely, an agreement with Mrs. Kionka according to which, in return for services rendered by Rose Marie Gaertner, Mrs. Kionka had agreed to pay the two sums of $5,000 each. During the course of taking testimony, it developed that Miss Gaertner, after filing these claims, reached an agreement with Mrs. Hebbard, the adopted daughter, that if Mrs. Hebbard were successful in having the property declared homestead, that it be sold and the sales price equally divided.
The lower court found that there was no legal duty of support from Mrs. Kionka to Rose Marie and her son, but that Mrs. Kionka treated said parties as members of her family; that Mrs. Kionka was the head of the household; that Rose Marie and her son were members of her family group and therefore the property in question was the homestead property of Anna Z. Kionka at the time of her death leaving surviving her daughter, Margaret Ann Hebbard. The lower court, in effect, held that at the time of her death Mrs. Kionka was the head of a family within the meaning of the Florida *606 Constitution, Section 1 of Article 10, F.S.A., and that the attempted testamentary devise was invalid as to the home place.
The question of what constitutes the head of a family under the above constitutional section has been the subject of a number of decisions, but we have found no Florida cases construing this provision as applied to an alleged family group, the members of which are unrelated by blood to "the head" of that "family". Research as to cases in other jurisdictions reveals a dearth of authority there.
The early case of Johns v. Bowden, 68 Fla. 32, 66 So. 155, 159, although not involving strangers in blood, states the rule of law which appears to have been uniformly followed in this state and by the weight of authority in other jurisdictions. In that case, it is stated:
"To constitute a `head of a family' there must be at least two persons who live together in the relation of one family, and one of them must be `the head' of that `family.' When the natural relation of husband and wife or parent and child, or that of being in loco parentis, does not exist, the relation should be one in which an established and continuing personal authority, responsibility, and obligation actually rests upon one as `the head of a family' for the welfare of the others who, in law, should, or, in fact, do, recognize and observe a family relation to the one as `the head of a family.'" (Emphasis supplied.)
It has been loosely stated that a party constitutes the head of a family if there is a family at law or a family in fact. Beck v. Wylie, Fla., 60 So.2d 190; Solomon v. Davis, Fla., 100 So.2d 177, 179. Parties cannot stipulate as to a family relationship so the rule of "personal authority and responsibility" has been generally used to determine the family head where a family in law does not exist, Solomon v. Davis, supra; Shambow v. Shambow, 153 Fla. 760, 15 So.2d 836. The relationship should be one in which an established and continuing personal authority, responsibility and obligation actually rests upon one as the head of a family for the welfare of others. Although some states have adopted the view that there must be a legal obligation on the head of the family to support the members thereof, it is the general rule following Johns v. Bowden, supra, that this obligation may be a legal or moral duty to support. In the frequently cited case of Roco v. Green, 50 Tex. 483, 488, the court stated:
"We deduce from the authorities the following general rules to determine when the relation of a family, as contemplated by law, exists: (1) it is one of social status, not of mere contract, (2) legal or moral obligation on the head to support the other members; (3) corresponding state of dependence on the part of the other members for this support." (Emphasis supplied.)
The principle of a legal or moral duty to support was recognized in the case of Whidden v. Abbott, 124 Fla. 293, 168 So. 253, where a son and his family moved into the home of his father for the purpose of providing shelter for his wife and children and to take care of the aged father. The father was not responsible for, and did not assume, the support and maintenance of the family, the arrangement being for the mutual benefit of all parties. Even though the son testified he considered the father the head of the family, the court did not so find. To the same effect is Dania Bank v. Wilson & Toomer Fertilizer Co., 127 Fla. 45, 172 So. 476, and Moorhead v. Yongue, 134 Fla. 135, 183 So. 804, annotated in 118 A.L.R. 1377. In Union Trust Company v. Cox, 55 Okla. 68, 155 P. 206, 209, annotated in L.R.A. 1917C, 356, the problem is stated as follows:
"As to what constitutes the head of a family under the exemption laws, the authorities seem to be conflicting; but the great weight of modern authorities, *607 we think, holds that, in order to constitute the head of a family within the purview of the exemption laws, there must be at least a condition of dependence on the part of the other members upon the head, and a legal or moral obligation on the part of the head to support them, and that a mere collection of individuals does not satisfy the requirements of the statute."
If there is a family in law, the father will be presumed to be the head and it is not necessary that the parties live together so long as he had the legal obligation to support the other members. O'Neal v. Miller, 143 Fla. 171, 196 So. 478, 129 A.L.R. 295; Brodgon v. McBride, Fla., 75 So.2d 770. If the relationship is based on "the family in fact" theory, parties must live together. Moorhead v. Yongue, supra.
In Calhoun v. Williams, 32 Grat., Va., 18, 34 Am.Rep. 759, the court in reviewing a head of a family status in an employer-employee relationship stated:
"The law imposes a duty growing out of status and not out of contract and the persons to whom he owes this duty, if dwelling together in a domestic establishment, constitute a family of which he is the head."
Obviously, if the deceased is to be held the head of a family in fact, there must be a determination that she had the personal responsibility and moral obligation to support Rose Marie and her illegitimate child. Our research fails to disclose a single case where a party has been held to be a head of a family in circumstances similar to this case. In the case of Union Trust Company v. Cox, supra, the court refused the head of a family status where an elderly lady in poor health brought a cousin to live with her, their support being obtained from proceeds of the farm on which they lived. The court stated:
"* * * we find collated a large number of adjudicated cases giving examples of those who go to comprise a family; but none seem to have carried the relationship far enough to reach cousins."
The court, in expressing its reluctance to extend the rule, stated:
"We find no adjudicated case holding that the duty to support and maintain a cousin is greater than the duty to pay one's debts, and we believe the better reasoning supports the proposition that a debtor has no moral or legal right to appropriate assets that should be applied to the payment of one's debts and expend the same in providing a home for so distant a relative as a cousin."
Where an unmarried woman undertook to support her nieces and nephews whose mother was insane, she was held to be the head of a family on the ground that having undertaken to rear and train them, it fixed upon her a moral obligation to continue to do so as long as they were in a state of dependency which included not only food and clothing, but moral and mental training. American National Bank v. Cruger, 31 Tex.Civ.App. 17, 71 S.W. 784. However, where such children were strangers in blood and the party therefore had no natural or legal obligation, it has been held there is no moral duty to support them and the party may at any time separate from and cease to support or care for them without violating any obligation. Galligar v. Payne, 34 La. Ann. 1057; Prudential Insurance Company of America v. Guillory, 175 La. 1058, 145 So. 6; Whaley v. Whaley, 50 Mo. 577; Bosquett v. Hall, 90 Ky. 566, 13 S.W. 244, 9 L.R.A. 351. A woman having exclusive care of her son's illegitimate child for eight years has been held not to be the head of a family. Askew v. Parker, 131 La. 753, 60 So. 233.
Although Mr. and Mrs. Kionka might have assumed some responsibility in requesting his adult niece to move from Germany to America to live with them, it does not appear that they intended to or did legally adopt her. Any moral obligation *608 incurred would certainly have been fulfilled by the material benefits bestowed upon her prior to the death of Mr. Kionka. Whether or not Mrs. Kionka attained the legal status as the head of a family after his death would depend entirely upon her legal or moral duty to support, care for, and train, members of the family group, namely, Rose Marie Gaertner originally, and later Rose Marie Gaertner and her son. We do not find, as a matter of law, that there was any such moral obligation. Mrs. Kionka could have terminated the relationship in full good faith at any time she so desired. She had no moral duty to care for and support Rose Marie who was a fully competent adult and able to earn her own living. The birth of the illegitimate child to Rose Marie, although placing certain obligations and responsibilities on Rose Marie, could not be construed as increasing Mrs. Kionka's moral obligation. This association did not entail any legal or moral duty but was, in the final analysis, an arrangement for the mutual benefit of Mrs. Kionka and Rose Marie Gaertner. This arrangement or voluntary bounty on the part of Mrs. Kionka should not operate to abrogate her right to dispose of her home by will.
The order of the lower court is reversed for further proceedings in compliance herewith.
KANNER, Acting Chief Judge, and SHANNON, J., concur.